UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                        :
MICHAEL BIRCH,                                          :
                                                        :
                                                        :
                    Plaintiff,                          :   **MEMORANDUM DECISION AND**
                                                        :   **ORDER**
                                                        :
         -against-                                      :    16-cv-34 (BMC)
                                                        :
                                                        :
 THE CITY OF NEW YORK, *et al*.,                        :
                                                        :
                    Defendants.                         :
-------------------------------------------------------- X

**COGAN, District Judge.**


       Plaintiff, a New York City police officer, brings this First Amendment retaliation claim

under 42 U.S.C. § 1983, asserting that as a result of complaining about arrest quotas imposed on

him, he suffered various adverse employment actions.  The complaint fails for each of the

reasons set forth in defendants' motion to dismiss: (1) most of his claims are time-barred; (2) all

defendants are entitled to qualified immunity because the law as to whether plaintiff's speech

was protected was unsettled at the time of the alleged retaliation; (3) any claims that are not

time-barred are so temporally removed from plaintiff's protected speech or time-barred

retaliatory acts that his claims fail for lack of a causal connection; and (4) as against the present

and former police commissioners, there are no allegations of personal involvement.  Because

there are no adequately pled underlying constitutional violations, his claim under Monell v.

Dep't of Soc. Serv. of the City of New York, 436 U.S. 658, 98 S. Ct. 2018 (1978), also fails.

## SUMMARY OF COMPLAINT

The non-conclusory factual allegations of the complaint are as follows:

Plaintiff has been a New York City police officer for 16 years.  In December, 2011, a non-defendant police Sergeant, Richard Healy, told him that he (plaintiff) was going to get a negative performance review for 2011 because plaintiff had made an insufficient number of arrests and issued an insufficient number of summonses.  Healy told plaintiff that this was coming from defendant Constantin Tsachas, the Commander of Transit District 34, where plaintiff was assigned, and non-defendant Lieutenant Paul Eng.  Healy further told plaintiff that he should try to increase his numbers, and that Tsachas wanted 10 transit summonses and one arrest per month.  Plaintiff responded that he wasn't trying to reach specific numbers; that he was just trying to do his job; and that the numbers that Healy said Tsachas wanted sounded like quotas.  Healy replied that they were not quotas; that he was just trying to give plaintiff an opportunity to get on "par" with the other officers in the district; and that plaintiff could do what he wanted with the advice that Healy was giving him.

Plaintiff alleges that following this conversation, he was placed into "Level One Performance Monitoring," which is not defined in the complaint, except to conclusorily allege that this status is used to punish police officers who do not meet the quotas, and that most of those officers are people of color.  Healy and Eng told plaintiff that this status was imposed on him due to his "lack of activity."

In March, 2012, plaintiff had a meeting with Healy, Eng and Tsachas. He received a 2.5 evaluation rating (which isn't defined, but apparently isn't very good).  They attributed his

negative rating to his lack of activity, but Tsachas was focused solely on plaintiff's failure to meet performance goals, which plaintiff considers a euphemism for quotas. Plaintiff refused to sign this evaluation. Following the meeting, between May and August, 2012, plaintiff was given undesirable assignments, as well as denial of overtime opportunities and requested days off.

In August, 2012, plaintiff met with an otherwise unidentified non-defendant, Lieutenant King, who showed him an evaluation approved by Tsachas of 2.0. This low score was again based on plaintiff's lack of activity. Plaintiff again refused to sign it, and requested a meeting with Tsachas. The meeting occurred on August 24, 2012; in addition to Tsachas, it was attended by two otherwise unidentified non-defendants, Lieutenant Frank Monti and Sargent Mai. While reviewing a computer data printout, Tsachas told plaintiff that he was not stopping enough black and Hispanics, and expressed surprise that plaintiff had stopped more females than males. Plaintiff replied that he does not target people, but Tsachas replied that if plaintiff filled out the appropriate form, they deserve to be stopped.

For the next month, plaintiff continued to be given undesirable assignments and was subjected to the denial of overtime opportunities and requested days off. On September 26, 2012, plaintiff was placed on modified assignment after having been accused of making false entries in a memo book. The modified duty assignment was ordered by defendant Joseph Fox, the Chief of the Transit Bureau. Plaintiff denies making any false entries in his memo book, but he did make entries protesting the imposition of quotas. Shortly after this incident, he was transferred out of the Transit District to a Housing Police Unit. On October 15, 2012, he was relegated to "Level Two Performance Monitoring" on the recommendation of Tsachas.

Plaintiff complained to the Employee Management Division that he was being rated unfairly, but the Employee Management Bureau did not convey his complaint to the Internal Affairs Bureau, as it should have pursuant to the NYPD's employee management procedures.

While at the Housing Police Unit, plaintiff had no performance issues, actual or alleged, from his assignment in October 2012 through February 2014, and he was then restored to full duty status.   Shortly thereafter, he was transferred to the 69th Precinct.  He requested additional training because of the new assignment, but never received it.

On February 24, 2014, plaintiff was formally charged with having made false entries in his notebook, the incident of which he had previously been accused by Fox.  In January, 2015, he was transferred to the 79th Precinct.  He had no performance issues until September, 2015, when he was charged with mishandling a domestic violence assignment.

Those are the non-conclusory allegations in the complaint.  Based on them, plaintiff alleges that he has been punished for having spoken out against a quota system targeting minorities that is enforced by the NYPD.  In addition to naming Tsachas and Fox, plaintiff has sued former Police Commissioner Kelly and current Police Commissioner Bratton, alleging that they must have known of the existence of quotas yet denied their existence.  Plaintiff has sued the City under Monell on essentially the same basis.

## DISCUSSION

## I

This action was commenced on January 5, 2016.   It is common ground that there is a three year statute of limitations for First Amendment Claims under 42 U.S.C. § 1983.  See Smith v. Campbell, 782 F.3d 93, 99-100 (2d Cir. 2015).  Defendants' argument asserts that the 2012

4

negative evaluations, performance monitoring, modified duty assignments, denial of overtime opportunities, and requested days off are time-barred.  Plaintiff has not challenged defendants' contention that his First Amendment claim accrued when defendants committed these acts.

Instead, plaintiff has determined to take an "all or nothing" approach, contending that nothing is barred pursuant to the continuing violation doctrine.  This, in turn, is based on plaintiff's argument that a First Amendment retaliatory act exerts a continuing "chilling effect" on a plaintiff's freedom of expression, and because the chilling effect continues, so does the statute of limitations.

I reject plaintiff's attempt to save four year old acts of retaliation from the statute of limitations through the continuing violations doctrine.  First Amendment and other retaliation claims are already given greater protection than most employment discrimination claims precisely because they can have a chilling effect on future expression.  In the Title VII discrimination context, only adverse employment actions that effect a material change in the terms and conditions of employment are actionable.  These are generally events that cause an out of pocket loss, like a demotion with financial consequences, or at least a lost opportunity to earn more money.  See Galabya v. New York City, 202 F.3d 636, 640 (2d Cir. 2000).  The Second Circuit has described them as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. at 640 (citing Crady v. Liberty Nat'l Bank & Trust Co., 9932 F.2d 132, 136 (7th Cir. 1993)).  Thus, a Title VII action alleging racial discrimination cannot be premised on a negative performance review, performance monitoring, or a within-grade transfer.  See Hicks v. Rubin, 6 F. App'x 70, 73 (2d Cir. 2001); Mix v. Delaware & Hudson Ry. Co., 345 F.3d 82, 89 (2d Cir. 2003).

5

In contrast, in retaliation cases, all that is required to maintain a claim is to show action that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights …." Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (internal citations omitted).  That can certainly consist of a negative performance review, performance monitoring, or a within-grade transfer.  See id. at 226; Ezuma v. City of New York, 665 F. Supp. 2d 116 (E.D.N.Y. 2009).  Although a retaliation claim cannot be based on a trivial slight, like refusing to allow an employee to bring a birthday cake to work, see Bart v. Telford, 677 F.2d 622 (7th Cir. 1982), it is clear that retaliation claims can be based on a broader spectrum of conduct than discrimination claims.  See Zelnik, 464 F.3d at 226, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 107, 122 S. Ct. 2061 (2002).

The trade-off for allowing an earlier suit, based on less severe actions, for retaliatory misconduct is that the continuing violation doctrine cannot be used to save stale claims.  If the employee is chilled, he is chilled when the misconduct occurs.  He can sue then, and the fact that he may fear additional retaliation in the future is no more reason to apply the continuing violation doctrine than there would be for a claim that someone who has been denied a promotion on racial grounds may fear that he will again be denied a promotion based on racial discrimination in the future.  See Gonzalez v. Hasty, 802 F.2d 212 (2d Cir. 2015).

In addition, plaintiff has given no indication of where the logical limit is of his attempted application of the continuing violation doctrine.  If the notion is that the employee will always be under a chill, plaintiff's theory would mean the statute of limitations never expires in retaliation cases, at least as long as the plaintiff remains employed, even if nothing retaliatory had happened to him for 20 years.  No case holds that.  Certainly, the case upon which plaintiff relies, Gonzalez, says just the opposite – discrete acts trigger the accrual of the statute and if those

discrete acts are not the subject of suit within three years of their occurrence, then suit upon them is time-barred.  Id. at 220.  If another discrete act of retaliation occurs, then plaintiff has a new claim that begins at that time, but it does not revive expired claims that could have earlier been the subject of suit.  Id. at 222.

The use of the continuing violations doctrine in claims for hostile work environment illustrates its appropriate application.  There are a number of acts that are not material adverse employment actions and will not trigger discrimination or hostile work environment claims. Although there are occasions when a single hostile act, not rising to the level of an adverse employment action, can support a hostile work environment claim, see Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000), the more usual hostile work environment claim is a collection of actions, none of which are severe enough to constitute an adverse employment action, but which collectively create a hostile environment that becomes actionable.  See Petrosino v. Bell Atlantic, 2385 F.2d 210, 223-24 (2d Cir. 2004).  The continuing violations doctrine is useful in that situation because there was never a particular time that a plaintiff could have brought suit until somewhere near the last act of which he complains.  That last act "anchors" the first act and allows the presentation of a timely, single claim for hostile work environment pursuant to the continuing violations doctrine.  See Morgan, 536 U.S. at 115-17. That is very different than the situation here, as plaintiff concedes that he was subjected to discrete retaliatory actions, any one of which could have been the subject of suit at the time each occurred.

I therefore hold that all instances of retaliation alleged in the complaint that pre-date January 5, 2013, are time-barred, which means that they cannot be the basis of an award of damages to plaintiff.  However, that does not mean they are irrelevant to the case.  To the extent

plaintiff has valid and timely claims for retaliation, those earlier acts may be admissible in evidence if relevant to show the existence of retaliatory intent for the later claims.  See Housing Works, Inc. v. City of New York, 72 F. Supp. 2d 402, 426 (S.D.N.Y. 1999).  Whether such later claims survive defendants' motion is addressed below.

## II

Defendants attack any remaining wrongful conduct that survives the statute of limitations on the ground of qualified immunity.  Qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (quoting McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)).

I must approach the issue of qualified immunity with particular caution when it is raised in a motion under Federal Rule of Civil Procedure 12(b)(6).  See Garcia v. Does, 779 F.3d 84, 97 (2d Cir. 2015).  That is because the availability of qualified immunity is often fact-intensive, and if facts are in dispute, a court may need to have a jury resolve them before it can decide whether qualified immunity bars a plaintiff's claim, see, e.g., Southerland v. City of New York, 680 F.3d 127, 161 (2d Cir. 2011), or, at least, it may require a full record on a motion for summary judgment to determine if there is a factual issue.  See e.g., Bendel v. Westchester Cty. Health Care Corp., 112 F. Supp. 2d 324 (S.D.N.Y. 2000).   However, if, upon drawing every factual inference in favor of the plaintiff, the question is purely the state of the law at the time of a defendant's allegedly tortious conduct, so that the court can determine whether a reasonable state agent should have known that what he was doing violated the law, then a court can determine the availability of qualified immunity on a motion to dismiss under Rule 12(b)(6).  See Hyman v.

Abrams, 630 F. App'x 40, 41 (2d Cir. 2015) (citing McKenna v. Wright, 386 F.3d 435-36 (2d Cir. 2004)).

Thus, the caution necessary to determine the applicability of qualified immunity on a motion to dismiss "does not mean that qualified immunity can never be established at the pleading stage." Garcia, 779 F.3d at 97.  Indeed, because the doctrine of qualified immunity seeks to protect state actors not only from liability, but from having to defend against protected claims, it is the obligation of the court to consider its availability at the earliest point in the case at which that availability can be determined.  See Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808 (2009) (Supreme Court "stressed the importance of resolving immunity questions at the earliest possible stage in litigation") (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534 (1991)).

Regardless of the posture of the case when the court determines the state of the law, the nature of the inquiry is the same.  As relevant to this case, among the factors that the Court must determine is whether the right that a defendant is accused of violating was "clearly established" at the time of the violation, pursuant to Supreme Court or Second Circuit authority.  See Looney v. Black, 702 F.3d 701 (2d Cir. 2012). The right is "clearly established" if  "the conduct at issue would have been understood by a reasonable defendant to be unlawful under the existing law." Id.  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  Reichle v. Howards, ⸻ U.S. ⸻, 132 S. Ct. 2088, 2093 (2012) (citations, modifications, and internal quotation marks omitted).

I believe that the instant case presents a situation where the issue of qualified immunity can be determined on the face of the complaint. Liberally construed, as defendants acknowledge they must do in connection with their motion, plaintiff's claim is that he complained that he was required to meet a quota of arrests and summonses, and when he did, defendants retaliated against him for having expressed his view that the practice was illegal.[1]  There are no facts necessary to determine the potential immunity of defendants beyond that statement of the theory of plaintiff's case.

At first blush, it might seem that there is no real issue of qualified immunity since it is so obviously illegal to enforce criminal laws on the basis of meeting quotas. But the obvious illegality is under the Fourth Amendment. The First Amendment analysis, which is the basis of plaintiff's claim here, is more nuanced as a result of the Supreme Court's 2006 decision in Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006), which restricted the First Amendment rights of public employees. Garcetti's two-prong test requires that for an employee to maintain a claim for a First Amendment violation, he must show both that the matter on which he spoke was a matter of public concern, and that the speech was not pursuant to the employee's official responsibilities.

In the instant case, plaintiff easily satisfies the threshold requirement of Garcetti; it is obvious that requiring a quota of arrests or summonses was a matter of public concern in 2012 (and probably well before), and defendants here do not contend otherwise. However, the issue of

---

[1] This is a very liberal construction of plaintiff's complaint indeed. There is no allegation that plaintiff's complaint or the alleged retaliation against him had anything to do with race-based quotas until the August, 2012 meeting, and even then, Tsachas's statement could reasonably be construed as criticizing plaintiff for refusing to arrest or issue summonses to blacks or Hispanics despite his knowledge that suspects within those protected classes had committed crimes. Similarly, plaintiff's alleged response was only that he does not "target" people, which is at best an indirect protest against race-based quotas. Nevertheless, defendants have assumed for purposes of their motion that plaintiff engaged in protected speech, as is appropriate in the context of the current motion.

whether a New York City police officer was required to protest such quotas as part of his job if his supervisor imposes them was not settled until the Second Circuit's 2015 decision in Matthews v. City of New York, 779 F.3d 167 (2d Cir. 2015), and the Court of Appeals' decision shows that the issue was fairly close.  To put the issue in context under Garcetti, in other words, if a New York City police officer protested quotas under Second Circuit or Supreme Court authority in 2012 as part of his job, then any alleged consequences from that protest were not actionable the First Amendment.  See Garcetti, 547 U.S. at 1960 (holding that a court deputy who spoke out about perceived flaws in a search warrant was acting within the scope of his employment and speech was not actionable under the First Amendment).

In Matthews, the Second Circuit concluded that protesting quotas was not part of a police officer's job and thus such protests were subject to protection under the First Amendment.  The Court focused in substantial part on two aspects of the Matthews record.  First, the Court read the officers' Patrol Guide, which defined police officers' duty to report misconduct, to not appear to require such protests.  The Patrol Guide provided that

> All members of the service must be incorruptible. An honest member of the
> service will not tolerate members of the service who engage in corruption or other
> misconduct. All members of the service have an absolute duty to report any
> corruption or other misconduct, or allegation of corruption or other misconduct,
> of which they become aware.

779 F.3d at 170.  And the Patrol Guide defined "corruption and other misconduct" as "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by a member of the service whether on or off duty." Id. at 171.  In addition, the Circuit focused on the deposition testimony in the record.  Specifically, a deputy police commissioner had testified that the existence of quota system was not misconduct that had to be reported under the Patrol Guide unless it resulted in unjustified arrests, and that "other

11

misconduct" only referred to violations of the New York Penal Law.  That deputy commissioner and Matthews' supervisors also testified that a police officer has no duty to monitor the conduct of his superior officers.

> Based on this record and applying the holding in Garcetti, the Second Circuit held that

> > Matthews's speech to the Precinct's leadership in this case was not what he was "employed to do . . . ." Matthews's speech addressed a precinct-wide policy. Such policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work . . . .

> > We hold that when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee.

Id. at 174.

> Matthews thus establishes that an officer engages in protected speech when he protests quotas, but it did not do so until 2015, well after the retaliation about which plaintiff is complaining here.  Moreover, it would not have been irrational for the Circuit to have concluded that an officer's duty to report "other misconduct" included the use of a quota system, given the nature of a police officer's function to uphold the law, and the plain meaning of the words. Indeed, that is what Judge Engelmeyer had concluded in his very thorough, 24-page decision that the Circuit reversed:

> > Taken together, the above factors, derived from Garcetti and its Second Circuit progeny, require the finding that, when Officer Matthews reported unlawful stops, arrests, and summonses and the quota policy from which they derived, he spoke as an NYPD employee, not a citizen. Officer Matthews' speech was compelled by the NYPD Patrol Guide; concerned the subject matter of his employment; was made internally; and lacked a direct civilian analogue. His speech therefore was not constitutionally protected.

Matthews v. City of New York, 957 F. Supp. 2d 442, 465 (S.D.N.Y. 2012), rev'd, 779 F.3d 167.

It thus seems clear that the issue of whether plaintiff had a right protectable under the First Amendment to engage in his alleged protest of the quota system was anything but "clearly established" at the time of the speech and the alleged retaliation.  See Lane v. Franks, ––– U.S. –––, 134 S. Ct. 2369, 2382 (2015).  Keeping in mind that it is only Second Circuit or Supreme Court authority that can establish the law for qualified immunity purposes, see Looney, 702 F.3d at 706, that did not happen until the Second Circuit's reversal of the district court in Matthews.  Indeed, given the careful analysis undertaken in both the district court and the Second Circuit and the conflicting results they reached, one could hardly say that the issue was "beyond debate," Reichle, 132 S. Ct. at 2093, since the courts were in fact having such a debate.  Thus, until the Matthews decision, defendants in this case had no clearly established reason to know that their conduct would be subjected to scrutiny under the First Amendment.

Plaintiff's arguments to the contrary are less than unpersuasive.  First, the complaint alludes to an article in the Village Voice in 2010, but there is no legal authority that gives entertainment publications a role in setting the parameters of qualified immunity.  Second, plaintiff relies upon the district court's decision in Floyd v. City of New York, 813 F. Supp. 2d 417 (S.D.N.Y. 2011), which denied defendants' summary judgment motion on plaintiffs' allegations that the NYPD supervisors had a widespread practice of imposing quotas on officers. The district court found that there was evidence of pressure or quotas but there were triable issues of fact.  That decision, however, is inapposite to resolving the issue of whether plaintiff's speech was protected under the First Amendment; besides, a single district court decision cannot "clearly establish" a constitutional right.  See Richardson v. Selsky, 5 F.3d 616, 623 (2d Cir. 1993) (citing Hawkins v. Steingut, 829 F.2d 317, 321 (2d Cir. 1987)).  Finally, plaintiff notes that amendments to the New York Labor Law in 2010 prohibited the impositions of quotas by

police departments, but state law cannot expand any more than it can limit rights under the First

Amendment.  See Clue v. Johnson, 179 F.3d 57, 62 n.3 (2d Cir. 1999) (citing Davis v. Scherer,

468 U.S. 183, 194 (1984)).  It is thus no coincidence that in deciding Matthews, the Second

Circuit cited none of the "authorities" that plaintiff relies upon here.

     The purpose of qualified immunity is well illustrated by the instant case.  The timing of

the commencement of this case case raises the possibility that plaintiff is using this lawsuit to

distract attention from the formal charges that are being prosecuted against him as a result of his

having been an underperforming employee years ago.  If the law protecting plaintiff's speech

had been well settled, this Court would have no hesitation in wading into this dispute.  But with

the constitutional borders of plaintiff's official responsibilities uncertain until the Second

Circuit's decision in Matthews, this Court is prohibited from acting as "a 'super personnel

department' that second guesses employers' business judgments.'" Byrnie v. Town of Cromwell,

Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (quoting Simms v. Oklahoma ex rel. Dep't of

Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999)).

### III

     There is an additional reason why plaintiff's claims that survive the statute of limitations

fail.  The law requires a causal connection between the protected speech and the retaliatory act.

Here, plaintiff engaged in protected speech (assuming it was such) in 2012 and was retaliated

against in 2012.  I have found those claims to be time barred.  Plaintiff further alleges, however,

that retaliation occurred again in 2014, after more than two years.  In fact, plaintiff alleges that

there were no issues in his performance between 2012 and 2014, which is another way of saying

that no acts of retaliation were taken against him for more than two years – other than his

contention, which I have rejected, that he was subject to continuous retaliation by way of his

reassignment. That is far too long a period to allow a fact-finder to reasonably determine that

actions taken against plaintiff in 2014 were in retaliation for speech he undertook in 2012.

As many cases have explained, there is no hard and fast rule for the amount of time that

must pass before a causal connection is necessarily broken, see Burkybile v. Bd. of Educ. of

Hastings–On–Hudson Union Free Sch. Dist., 411 F.3d 306 (2d Cir.2005), but two years is far

longer than any case that I have found.  See e.g., Preuss v. Kolmar Labs., Inc., 970 F. Supp. 2d

171, 198 (S.D.N.Y. 2013) ("[D]istrict courts in the Circuit have held that a passage of more than

two months between the protected activity and the adverse employment action does not allow for

an inference of causation.") (internal quotation marks omitted).  Indeed, it is the rare case that

finds a plausible claim when nearly a year rather than months have gone by.  Retaliatory intent

does not sit patiently like a spider in a web hoping that prey will wander in; the daily

employment relationship provides for constant opportunities and temptations to retaliate for

protected activity if an employer is of a mind to do so.  Plaintiff's claim, to the extent it is not

time-barred, fails for lack of causation.

## IV

It is axiomatic that for a defendant to be sued in any civil rights action, that defendant

must have personally been involved.  See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006).   In

order to state a plausible claim, a plaintiff must allege facts that tend to show that each defendant

knew of the illegal activity and either took action to support, or failed to exercise a responsibility

that the defendant had to prevent the illegal conduct.

The complaint contains not a single factual allegation implicating defendants former

Commissioner Kelly or current Commissioner Bratton.  There is not a memo they authored, a

word they said, or an action they took that shows any involvement in a decision to impose quotas

15

on plaintiff.  Instead, plaintiff's theory is based on bootstrapping.  He assumes the validity of his conclusory allegations that the New York Police Department had a department-wide quota system, and then having "established" that, he further alleges that because the Commissioners have "refuse[d] to admit illegal 'performance goal' exist," they are personally liable for the existence of those quotas.

This is a mere *ipse dixit*.  It is woefully insufficient to state a plausible claim against the chief executives of the Police Department. Indeed, if the general knowledge of the quota system was as extensive as plaintiff alleges in a conclusory manner, then there would most likely be something in the public sources that plaintiff cites showing how these defendants knew of and refused to prevent the scheme of which he complains.  In the absence of a single fact showing their personal involvement, plaintiff cannot pile inference upon inference out of thin air to create a plausible claim.

**V**

Since plaintiff has failed to state a plausible constitutional claim against any defendant, his claim against defendant City of New York under <u>Monell</u>, 436 U.S. 658, 98 S. Ct. 2018, also fails.

## CONCLUSION

Defendants' motion to dismiss [20] is granted.  The Clerk is directed to enter judgment

dismissing the complaint.

**SO ORDERED.**

Dated: Brooklyn, New York
       May 3, 2016

_____

U.S.D.J.